**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

    - v -                        16 Cr. 396 (GHW)

RASHEED BAILEY, et al.

        Defendant.

**SENTENCING MEMORANDUM ON BEHALF OF RASHEED BAILEY**

MORVILLO LLP
500 Fifth Avenue, 43rd Floor
New York, New York 10110
Telephone:    (212) 796-6330
Facsimile:    (212) 240-8267

*Attorneys for Defendant Rasheed Bailey*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND AND RELEVANT FACTS ..................................................................... 2

   I.   Rasheed's Childhood and Youth ................................................................................ 2

   II.   Rasheed's Adolescence, Reconnecting with His Mother ................................... 4

   III.   Rasheed Fathers A Child and Gets Arrested ........................................................ 6

   IV.   Rasheed's Release and Current Circumstances ................................................... 8

THE OFFENSE CONDUCT ................................................................................................. 9

THE CHARGES AND THE PLEA ...................................................................................... 9

SENTENCING ANALYSIS ................................................................................................. 10

   I.   The Sentencing Range Calculated Under the Guidelines ............................... 11

     A.   The Applicable Offense Level and Criminal History Category Under the Guidelines . 11

   II.   Factors to be Considered Under 18 U.S.C. §3553(a) ........................................ 12

     A.   Mr. Bailey's Criminal History Category Overstates the Seriousness of his Criminal History ........................................................................................................................ 14

     B.   Mr. Bailey's Efforts at Post-Offense Rehabilitation ....................................... 17

     C.   The Need to Avoid Unwarranted Sentencing Disparities ............................. 19

   III.   Mr. Bailey's Inability to Pay a Fine ...................................................................... 21

   IV.   Recommendation Against Denial of Federal Benefits ...................................... 22

CONCLUSION ..................................................................................................................... 22

# TABLE OF AUTHORITIES

## Cases

*Gall v. United States*, 128 S.Ct. 586 (2007) ............................................................... 13

*Koon v. United States*, 518 U.S. 81 (1996) .................................................................. 10

*Pepper v. United States*, 131 S. Ct. 1229 (2011) ......................................................... 10

*Simon v. United States*, 361 F. Supp. 2d 35 (E.D.N.Y. 2005) .................................... 10

*United States v. Barton*, 76 F.3d 499 (2d Cir. 1996) ................................................... 17

*United States v. Blake*, 89 F. Supp.2d 328 (E.D.N.Y. 2000) ...................................... 18

*United States v. Boykins*, 13 Cr. 654 (RWS), 2015 WL 3485475 (S.D.N.Y. June 2, 2015) .. 21, 22

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) ........................................... 10, 13

*United States v. Core,* 125 F.3d 74 (2d Cir. 1997) ...................................................... 19

*United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005) ........................................... 11, 13

*United States v. Jones,* 13 Cr. 654-1 (RWS)*, 2015 WL 5796950 (S.D.N.Y. Oct. 5, 2015) ......... 20

*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008) ............................................. 10, 13

*United States v. Kimbrough*, 552 U.S. 85 (2007) .................................................. 10, 19

*United States v. Munoz-Nava*, 524 F.3d 1137 (10th Cir. 2008) .................................... 13

*United States v. Nixon*, 13 Cr. 654 (RWS), 2015 WL 3484492 (S.D.N.Y. June 2, 2015) ........... 20

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009). .................................................. 10

*United States v. Williams,* 65 F.3d 301 (2d Cir. 1995) ................................................ 19

*United States v. Wong*, 40 F.3d 1347 (2d Cir. 1994) ................................................... 17

## Statutes

18 U.S.C. §3553(a) ................................................................................................. passim

18 U.S.C. §3572 ............................................................................................................. 25

21 U.S.C. §846 .................................................................................................... 9, 11, 20

21 U.S.C. §841(b)(1)(A) ........................................................................................... 9, 11

21 U.S.C. §841(b)(1)(B) ................................................................................................ 20

21 U.S.C. §862(a)(1)(A) ................................................................................................ 22

U.S.S.G. §4A1.3 ...................................................................................................... 14, 15

U.S.S.G. §2D1.1(c)(8) .................................................................................................. 11

U.S.S.G. §3E1.1 ............................................................................................................ 11

**Other Authorities**

*New York Still Charges Teenagers as Adults. Will Cuomo's Bill Change That?,*
   Miranda, Leticia (March 26, 2015)............................................................... 15

*Proposed Amendments to Guidelines,* (Dec. 19, 2016) ............................................. 12

## PRELIMINARY STATEMENT

Mr. Bailey respectfully submits this memorandum for the Court's consideration in advance of his sentencing.

Rasheed Bailey is a 22-year-old young man at a crucial point in his life.  He has lived a difficult and sometimes cruel life.  As a result, he made a series of bad choices in his teens and early twenties.  One of those bad choices brings him before this Court for sentencing.

Rasheed accepts responsibility for his actions and his decisions.  However, it is noteworthy that he had few, if any, positive influences in his life.  His parents essentially abandoned him at birth, leaving him with no mother or father to guide him.  His maternal grandmother took him into her home to raise him.  There, as a child, he suffered physical and emotional abuse at the hand of his guardian and primary caregiver.  Things got worse when, as a teenager, one of the only family members with whom he had a close relationship, his Aunt Clarice, died in a car accident.  In addition, he suffered physical and emotional abuse from neighborhood children for many years.

As Rasheed became a teenager his situation overwhelmed him as did the lack of adult guidance and assistance.  As a result, he engaged in reckless and at times unlawful conduct throughout his adolescence.  He began using drugs in his early teens; dropped out of school; and even started carrying a gun upon advice from his friends.  Pushed into early sexual activity by these same friends, Rasheed became a father by the age of 15.  Shortly thereafter, he became incarcerated for carrying the above referenced gun.  He served four years in prison and came out a shattered individual.

Upon return to New York City, Rasheed reengaged with the friends who had already steered him wrong.  Again, he made poor choices with their assistance.  This time, however,

Rasheed began selling drugs.  He became a low-level street dealer of crack cocaine in and around a New York City housing project.  This led to his instant arrest and guilty plea.

To his credit, Rasheed makes no excuse for his past conduct.  He recognizes that while life has not dealt him a favorable hand, that he made the decisions that bring him before the Court.  Moreover, he is determined to make a positive change for the future, for himself and for his son (something he was not prepared to do after his first juvenile arrest).  Rasheed respectfully requests that this Court consider his difficult life circumstances and his efforts and desire to turn over a new leaf in deciding an appropriate sentence.

<u>**BACKGROUND AND RELEVANT FACTS**</u>

### I.     **Rasheed's Childhood and Youth**

In January 1995, Shannon Bailey gave birth to her second child and first son, Rasheed O'Dell Bailey.  Shannon and Rasheed's father, Willie Hickman, had a casual relationship that ended soon after she became pregnant.  Hickman left 18-year-old Shannon to manage the pregnancy on her own.  As it turned out, Hickman was not the only one unwilling to be a real parent.

Soon after Rasheed's birth it became obvious that neither parent was willing to assume any responsibility for raising their child.  Hickman completely abandoned Shannon and Rasheed before he turned one year old.  Shannon, likewise, left raising Rasheed to others.  Rasheed spent the first ten years of his life with no meaningful relationship with his mother.

Shannon Bailey's mother, Patricia Bailey, took custody of Rasheed and became his primary caregiver.  During Rasheed's childhood, he lived with his grandmother, half-sister Shea, and Shannon's two younger sisters, Clarice and Shaniqua, in East New York, Brooklyn.  The family had little money, and received government assistance for food and housing throughout

2

Rasheed's youth.  Despite their dire financial situation, Patricia always made sure the children were fed, and that they had clean clothes and a roof over their heads.

Patricia adopted a very strict approach to raising Rasheed, particularly when it came to school.  Rasheed attended P.S. 202 elementary school from 2001 until 2008 but never rose above being an average student.  Patricia often whipped and berated Rasheed for doing poorly in school.  Moreover, he routinely misbehaved in school and at home.[1]  Both of these issues caused friction between he and his grandmother.  When Rasheed talked back to his grandmother, or she learned of his anti-social behavior at school, Patricia punished him by forbidding him from playing outside and/or forcing Rasheed to stay in his room alone.  In addition, Patricia meted out punishment by making Rasheed stand in the corner for long periods of time, while holding something heavy, such as a telephone book in each hand.

While in the third grade, the school therapist evaluated Rasheed ███████████████ ████████████████████████████████████████████████████ ████████████████████████████ Rasheed also attended weekly therapy sessions as part of his treatment plan.  Rasheed's behavior started to improve as a result.  However, Rasheed told the therapist about his home life and how his grandmother treated him.  When Patricia learned this, she terminated Rasheed's therapy sessions and discontinued his medication, claiming it worsened his condition.

Things did not get better for Rasheed.  He became more reclusive with each passing year and his behavior deteriorated, at least in part, as a result of his grandmother's harsh treatment.  He had no friends at school, and very few at home.  By sixth grade, Rasheed had had numerous

---

[1]     Rasheed has come to realize that his bad behavior stemmed from the fact that he blamed himself for his parents abandoning him, causing him to lash out, both at home and in school.

3

physical confrontations with his classmates.  His only solace during this time was that he grew close with his aunts with whom he spent time at home; they were his only friends.  Unlike his relationship with his grandmother, Rasheed connected with his aunts Shaniqua and Clarice and looked forward to seeing them each day.  Unfortunately, these relationships were not sufficient to keep him from making poor life choices.

## II.    Rasheed's Adolescence, and Reconnecting with His Mother

Rasheed met his mother for the first time at ten years old.  One day in 2005, Rasheed's Aunt Shaniqua decided he should meet his mother, and the pair traveled to Harlem to visit Shannon.  At the time, Shannon lived with Leonard King in the Drew Hamilton housing development.  After their initial meeting, the relationship between Rasheed and his mother began to take root.  Things progressed so well that, with their grandmother's permission, Rasheed and his half-sister Shea spent the following summer with Shannon and King.  In the fall, the siblings returned to their grandmother's home to attend school.  Rasheed continued to communicate frequently with Shannon.

Rasheed spent the next summer with his mother as well.  However after just a few weeks, Shannon moved out of King's apartment and into a shelter with Rasheed.  At the same time, she searched for her own apartment.  ███████████████████████████████████████████████

████████  When Rasheed's grandmother learned this, she demanded that Rasheed come back to live with her.  Rasheed reluctantly agreed, and returned to his grandmother's apartment where he remained through elementary school and for part of high school.  However, Rasheed had formed a bond with his mother and, for the first time in his life, his feelings of abandonment started to drift away.

During the summer of 2008, Rasheed's life changed dramatically when a motor vehicle struck and killed his Aunt Clarice. Clarice's sudden death hit Rasheed hard. Thirteen-year-old Rasheed had great difficulty processing what had happened. Because he was unable to deal appropriately with his grief, Rasheed ended up blaming his family for Clarice's death. He became withdrawn and more defiant than ever. He withdrew from everyone around him, and became increasingly hostile towards family members. As a method of lashing out at his grandmother and coping with his pain, Rasheed traveled to Harlem almost daily to spend time with friends he had made from his summers with Shannon. He openly disobeyed his grandmother's curfews and stayed out very late, telling no one where he was or what he was doing. He also started drinking and using marijuana.

In September 2008, Rasheed started ninth grade at Rachel Carson High School in Brooklyn. Still devastated from the death of his Aunt Clarice, Rasheed lost all interest in his studies. He skipped school to drink and smoke marijuana with his friends. At first he did this only in the afternoon, but, over time his absenteeism increased.

His disengagement from school peaked in 2010. At the same time Rasheed's relationship with his grandmother reached a breaking point. One night when Rasheed returned home long after his curfew, his grandmother caught him and a huge argument ensued. Things got so heated that Rasheed left his grandmother's home for good and moved in with his mother then living in the Bronx.

Rasheed's decision to move in with his mother made a bad situation worse. His drug use increased, and his school attendance dropped to an all-time low. He cobbled together enough present days in school to pass through freshman and sophomore years. By his junior year, in

2011, Rasheed dropped out of high school altogether.  From then on, he spent his days with his friends in Harlem, learning about and living life on the street.

In and around this time, Rasheed started to get in trouble with the law.  Rasheed spent a significant amount of time at the Drew Hamilton housing development, which was something of a hotbed for criminal activity.  Police maintained an active presence in the area.  Consequently, Rasheed and his friends were routinely stopped and interrogated by police officers.  Indeed, many of the boys in Rasheed's group sold drugs and carried guns.  They encouraged Rasheed to sell drugs too, and told him that he needed to carry a gun in the neighborhood for protection. With the help of one of his older friends, Rasheed managed to obtain a gun.  He came to believe that he needed a gun to protect himself, and began to carry it with him almost all the time. Rasheed embraced this lifestyle and continued to spiral down a path which ultimately led to his 2011 arrest and subsequent incarceration.

Rasheed's friends provided not only the above referenced "career" advice, but also personal advice.  Their guidance steered him to engage in sexual activity with as many women as possible.  Rasheed followed this advice as best a 15-year-old boy could.

### III.    Rasheed Fathers a Child and Gets Arrested

In approximately 2009, Rasheed met Sade Gonzalez.  Although Sade was 20 and Rasheed was 14, they started a romantic relationship and dated intermittently over the course of several years.  Soon after the relationship started, Sade became pregnant.  Rasheed, at the age of 14 was about to become a father.

On ▮▮▮▮▮▮▮▮ Sade gave birth to a son, ▮▮▮▮▮▮▮▮▮▮ Sade told Rasheed he was the father.  Rasheed, terrified at the thought of being responsible for a child, refused to believe Sade at first.  As his initial shock faded, Rasheed did his best to accept that he had

fathered a child.  Over time, Rasheed started to play a role in ████████ life.  Even after the

young couple ended their relationship, Rasheed did his best to remain present in ████████ life.[2]

      In 2011, Rasheed experienced another life-changing event when police arrested him and

the state of New York charged him with criminal possession of a weapon.  Rasheed pleaded

guilty to possession in the second degree and was adjudicated a youthful offender.  Although he

was only 16-years-old, New York State treated Rasheed as an adult offender and sentenced him

to up to four years' imprisonment at a state correctional facility located in upstate New York.

      Rasheed spent almost the entire four years in prison.  Because New York State treated

him as an adult offender, it placed him in a general population housing unit alongside violent

felony offenders and gang members.  As a 16-year-old boy living among adult criminals,

Rasheed often could not sleep at night.  He again felt a sense of abandonment because none of

his friends or family members came to visit him, including Sade and ████████

████████████████████████████████████

Rasheed believes that the other inmates sensed his vulnerability.  Consequently, they bullied and

antagonized him, particularly for having no visitors and receiving little mail.  When Rasheed

tried to defend himself it always ended in physical confrontations with the adult inmates.  As

such, he often found himself alone in the segregated housing unit.  It was a difficult four years.

      One good thing happened to Rasheed while in prison.  He realized that he needed an

education.  Thus, during his period of incarceration, Rasheed focused on completing his

education.  In 2013, Rasheed passed the General Education Development exam ("GED").  In

March 2015, New York State saw fit to release Rasheed on parole.

---

[2]    In 2015, Sade and ████████ moved to Baltimore to be near her family.  Rasheed has
made efforts to contact them, but all efforts have gone unanswered.

**IV.     Rasheed's Release and Current Circumstances**

In March 2015, Rasheed left prison and returned to New York City.  During his time away, his mother relocated from New York to Binghamton, New York.  With his mother no longer residing in the city, Rasheed did not have a stable place to live.  As such, he stayed in various three-quarter houses and shelters, including Narco Freedom and Bellevue Men's Shelter.

New York State released Rasheed from parole in September 2015.  Over the course of the next ten months, between September 2015 and July 2016, Rasheed was essentially homeless.  It was not uncommon for him to wake up in the morning and not know where he would sleep that night.  He often imposed on friends and family for a bed or couch.  When he could not find a familiar place to spend the night, he slept on the streets, or at a local shelter.

In the aftermath of his incarceration and as a result of his homelessness his old habits of getting high and making unhealthy decisions resurfaced.  Prior to spending time in prison, Rasheed did not abuse alcohol.  After his release, however, he started to drink on a daily basis.  Likewise, he started to smoke marijuana again.  This time he increased his usage often getting high more than four times a day.  In the end, Rasheed was broken to the point where he simply did not want to remain sober.

To make matters worse, he reconnected with his friends from Harlem.  This caused him to fall back into his old ways.  Unfortunately, his conduct escalated.  Instead of just using illegal drugs, Rasheed started to sell them.  By 2015, he became a low-level street dealer of crack cocaine.  On March 31, 2016, the authorities arrested Rasheed for selling crack cocaine.  He entered a guilty plea on January 11, 2017.

## THE OFFENSE CONDUCT

Between 2015 and 2016, Rasheed Bailey sold crack cocaine in and around the Lincoln Housing Development in Harlem.  Mr. Bailey worked as a low-level street dealer of crack cocaine.  He purchased small amounts of crack cocaine from a coconspirator and sold it to neighborhood drug users.  Mr. Bailey kept whatever money he made for himself.  He had no knowledge of how the drugs were obtained, nor was he a leader or organizer of the conspiracy.

As part of the instant offense, police conducted over 200 undercover buys of crack cocaine at the Lincoln Housing Development.  Mr. Bailey participated in three of those purchases.  He met with the prospective buyers and brought them to a location where the exchange could occur undetected.  Mr. Bailey then provided crack cocaine to the buyer in exchange for money.

## THE CHARGES AND THE PLEA

In March 2016, officers from the NYPD and the Bureau of Alcohol Tobacco and Firearms arrested Mr. Bailey in connection with the sale of drugs.  The government charged Mr. Bailey by complaint for possession of a controlled substance and released him under regular pretrial supervision conditions.

On June 16, 2017, a grand jury indicted Mr. Bailey on one count of conspiracy to distribute and possess with the intent to distribute 280 grams or more of crack cocaine in violation of 21 U.S.C. §§ 846, 841(b)(1)(A).

On January 11, 2017, pursuant to a written plea agreement with the government (the "Plea Agreement"), Mr. Bailey pleaded guilty to the lesser-included offense of 21 U.S.C. §§ 846, 841(b)(1)(C).

## <u>SENTENCING ANALYSIS</u>

It is axiomatic that Section 3553(a) of Title 18 of the United States Code controls sentencing in criminal cases.  It provides that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes [of sentencing]."  18 U.S.C. §3553(a); *see also*, *United States v. Stewart*, 590 F.3d 93, n.17 (2d Cir. 2009).  As this Court well knows, it has "very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime."  *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc).

The Court must calculate the United States Federal Sentencing Guidelines (the "Guidelines") before imposing sentence, but is not obligated to impose a sentence consistent therewith.  "The Guidelines are guidelines—that is, they are truly advisory" and "a district court may not presume that a Guidelines sentence is reasonable."  *Id*. at 189.  The Guidelines merely come into play as one among many factors contemplated under §3553(a).  In considering the §3553(a) factors, the Court should give no greater weight to the Guidelines calculation than any of the other factors.  *See United States v. Kimbrough*, 552 U.S. 85, 101 (2007); *see also Simon v. United States*, 361 F. Supp. 2d 35, 40 (E.D.N.Y. 2005).  Indeed, the Court "must make an individualized assessment of the sentence warranted by Section 3553(a) based on the facts presented."  *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008) (internal quotations omitted).  Thus, the Court must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Koon v. United States*, 518 U.S. 81, 113 (1996).  "Underlying this tradition is the principle that the punishment must fit the offender and not merely the crime." *Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011) (internal citations omitted).  After considering the §3553(a) factors, the Court should decide whether to "impose . . . a sentence

within the applicable Guidelines range or within permissible departure authority," or "to impose a non-Guidelines sentence." *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). For the reasons stated below, Mr. Bailey respectfully requests that this Court impose a non-Guidelines sentence in this case.

## I.   The Sentencing Range Calculated Under the Guidelines

### A. *The Applicable Offense Level and Criminal History Category Under the Guidelines*

The Court must calculate Mr. Bailey's Guidelines range as a part of sentencing. Mr. Bailey's Indictment charged one count of conspiracy to distribute and possess with the intent to distribute 280 grams or more of crack cocaine in violation of 21 U.S.C. §§ 846, 841(b)(1)(A). Mr. Bailey agreed to plead guilty to the lesser-included offense of conspiracy to distribute and possess with the intent to distribute 28 to 112 grams of crack cocaine. As a result, Mr. Bailey's base offense level under the Guidelines is 24. *See* U.S.S.G. §2D1.1(c)(8). Mr. Bailey demonstrated his acceptance of responsibility by pleading guilty in a timely fashion. Therefore, after adjusting the offense level for Mr. Bailey's acceptance of responsibility under U.S.S.G. §3E1.1 (a) and (b), the total applicable offense level is reduced to 21 under the Guidelines.

Similarly, the Court must calculate Mr. Bailey's criminal history category ("CHC") under the Guidelines. Mr. Bailey's previous criminal convictions add up to seven criminal history points under the Guidelines, placing him in a CHC of IV. Mr. Bailey's criminal history score under the Guidelines is based on the following: one point based on an April 2016 conviction for unlawful possession of marijuana; one point based on a March 2016 conviction for unlawful possession of marijuana; three points based on a 2011 youthful offender adjudication for unlawful possession of a firearm in the second degree; and two points for committing the instant offense while on parole for the 2011 youthful offender adjudication.

11

The government calculated only two criminal history points in the Plea Agreement.  It did not count Mr. Bailey's youthful offender adjudication.  Thus, while Mr. Bailey agreed to a criminal history calculation that resulted in a CHC of II and a sentencing range of 41 to 51 months, a proper analysis places him in a CHC of IV, with a sentencing range of 57 to 71 months.

Mr. Bailey respectfully submits that the CHC substantially overstates the seriousness of his criminal history, and that a careful review of the relevant §3553(a) factors weighs in favor of a non-Guidelines sentence in this case.  Specifically, and discussed in more detail below, Mr. Bailey argues that upcoming amendments proposed by the Sentencing Commission disfavor the inclusion of three additional points based on Mr. Bailey's 2011 youthful offender adjudication. (Exhibit B, *Proposed Amendments to Guidelines,* Dec. 19, 2016, at 31, *available at:* http://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20161219_rf_proposed.pdf).

## II.    Factors to be Considered Under 18 U.S.C. §3553(a)

As this Court well knows, the Guidelines are not the only consideration for sentencing. Section 3553(a) requires courts to contemplate additional factors, even those disfavored under the advisory Guidelines.  The factors are as follows:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to (a) reflect the seriousness of the offense, to promote respect for the law, and to provide punishment for the offense, (b) to afford adequate deterrence to criminal conduct, and (c) to protect the public from further crimes of the defendant; (3) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of

similar conduct; and (4) the need to provide restitution.  *See* 18 U.S.C. §3553(a); *Cavera*, 550 F.3d at 189; *see also United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005).

The Court can use any individual factor it deems compelling to justify a downward variance that results in leniency for a defendant.  In contemplating the §3553(a) factors, the Court – taking account of all the mitigating circumstances in this case – must arrive at a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  18 U.S.C. §3553(a); *see also, Gall v. United States*, 128 S.Ct. 586, 596-97 (2007).  Neither the nature nor circumstances of the offense nor the history and characteristics of the defendant need be extraordinary to justify a deviation from the advisory Guidelines range.  *See id.* at 594-95 ("We reject . . . an appellate rule that requires 'extraordinary' circumstances to justify a sentence outside the Guidelines range."); *see also, United States v. Jones*, 531 F.3d 163, 171 (2d Cir. 2008) ("In reviewing a district court's explanation of a sentence for reasonableness at either the procedural or substantive step of analysis, *Gall* holds that an appellate court may not demand 'extraordinary' circumstances to justify non-Guidelines sentences.").  Indeed, downward variances may be based on factors that are "disfavored" under the Guidelines, even in the absence of extraordinary circumstances.  *See United States v. Munoz-Nava*, 524 F.3d 1137, 1148 (10th Cir. 2008).

An analysis of the §3553(a) factors demonstrates that Mr. Bailey's situation militates in favor of leniency.  Addressing the relevant §3553(a) factors in turn, Mr. Bailey submits that his circumstances warrant a non-Guidelines sentence for three principal reasons:  (1) Pursuant to §3553(a)(1), the nature and circumstances of the offense and the history and characteristics of the defendant, Mr. Bailey's criminal history category substantially overstates the seriousness of his criminal history; (2) pursuant to §3553(a)(2)(a), the need to reflect the seriousness of the

13

offense, to promote respect for the law, and to provide punishment for the offense, Mr. Bailey

has demonstrated real efforts at post-offense rehabilitation; and (3) pursuant to §3553(a)(3), the

need to avoid unwarranted sentencing disparities.

A. *Mr. Bailey's Criminal History Category Overstates the Seriousness of his Criminal History.*

Mr. Bailey respectfully requests a downward variance because the CHC calculated under

the Guidelines substantially overstates the seriousness of his criminal history.  The Guidelines

permit sentencing courts to impose below-Guidelines sentences where the court determines that

the calculated CHC substantially over-represents the seriousness of the defendant's criminal

history.  *See* U.S.S.G. §4A1.3.

As discussed above, the Guidelines place Mr. Bailey in a CHC of IV.  This equates to a

recommended Guidelines range of 57 to 71 months.  (PSR ¶101).

Mr. Bailey respectfully submits that 57 to 71 months, based on an inflated CHC in

category IV rather than II, substantially overstates the seriousness of his conduct in the instant

matter.[3]  The difference between the PSR CHC and that which Mr. Bailey submits is reasonable

is that the PSR adds three points based on Mr. Bailey's 2011 youthful offender adjudication for

possession of a firearm in the second degree in violation of New York State law.  To be clear,

Mr. Bailey acknowledges that the PSR calculates the CHC properly.  However, there is a shift

afoot in the manner in which the Sentencing Commission suggests courts calculate a defendant's

CHC under the Guidelines, specifically, with respect to prior youthful offender adjudications.

---

[3]     A sentence in that range would also not take into account his personal history and the difficult life he has led.  Mr. Bailey respectfully submits that his personal history also warrants leniency from this Court.

In December 2016, the Sentencing Commission announced a policy initiative against counting criminal history points for a prior adult criminal conviction of an offense committed before the age of 18, if it would have been classified as a juvenile adjudication if the laws of the jurisdiction of the conviction did not categorically consider offenders below the age of 18 years as "adults."  *Proposed Amendments to Guidelines,* Dec. 19, 2016, at 31, *available at:* http://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20161219_rf_proposed.pdf.  The Sentencing Commission's proposed changes in eliminating counting youthful offender adjudications when calculating criminal history points is as follows:

> The proposed amendment also amends the Commentary to §4A1.3 (Departure Based on Inadequacy of Criminal History Category (Policy Statement)) to provide an example of an instance in which a downward departure may be warranted if the defendant had an adult conviction for an offense committed prior to age eighteen counted in the criminal history score that would have been classified as a juvenile adjudication (and therefore not counted) if the laws of the jurisdiction in which the defendant was convicted did not categorically consider offenders below the age of eighteen years as "adults."

*Id.*

New York is one of only two states in which a 16-year-old facing criminal charges is automatically placed into the adult criminal system.  *See also New York Still Charges Teenagers as Adults. Will Cuomo's Bill Change That?,* Leticia Miranda, March 26, 2015, *available at:* https://www.propublica.org/article/new-york-still-charges-teenagers-as-adults.-will-cuomos-bill-change-that.  Not only does the Sentencing Commission's proposed amendment related to youthful offender adjudications take into consideration the lack of maturity and vulnerability to peer pressure exhibited by 16-year-olds, it also goes hand-in-hand with a bill New York State Governor Andrew Cuomo previously proposed that sought to "raise the age of adult criminal

responsibility to 18 and would prohibit minors from being held in any adult facility." *Id.* By proposing this amendment, the Sentencing Commission recognizes not just a distinction between an adult's ability to make an informed decision versus a teenager's, but also the dangers of housing together offenders of all ages.

In relation to the instant matter, Mr. Bailey was only 16 years old when New York State adjudicated him a youthful offender but treated him as an adult for his criminal conviction for possession of a firearm. While Mr. Bailey takes responsibility for his past conduct, at just 16 years old, his actions were in part a result of a lack of maturity, increased vulnerability to peer pressure, and an inability to fully comprehend the long-standing consequences of his actions. Mr. Bailey respectfully requests this Court consider these same Sentencing Commission articulated policy reasons to conclude that Mr. Bailey's CHC of IV overstates the seriousness of his actual criminal history.

In addition, Mr. Bailey played a minor role in the conspiracy. As noted above, police conducted approximately 200 controlled, undercover purchases of narcotics in and around the Lincoln Housing Development. Mr. Bailey participated in only three of those 200. This demonstrates that he is not a high-level participant in these sales. Furthermore, he is not an organizer or leader of the conspiracy. In fact, he is a minor, low level street dealer. As such, the recommended Guidelines sentence of 57 to 71 months is extraordinarily harsh when compared to the conduct at issue. Mr. Bailey respectfully requests that this Court conclude, based on the defendant's actual conduct and on a CHC that the Sentencing Commission suggests should not include three points for his youthful offender adjudication, that a Guidelines range of 57 of 71 months goes well beyond that which is necessary to punish the behavior at issue.

B.  *Mr. Bailey's Efforts at Post-Offense Rehabilitation*

Mr. Bailey has made efforts to demonstrate post-offense rehabilitation.  During his pre-trial supervision, Mr. Bailey relocated from New York City to Binghamton.[4]  While in Binghamton he resided with his mother, and more importantly, away from the environment in which he committed the instant offense.  He also, for the first time in his life, obtained gainful employment.  Mr. Bailey got a job at Macy's Department Store in Binghamton, New York, working in the Receiving Department.  By all accounts he did well and remained employed until November 2016, when the store let go of all its temporary, seasonal staff, including Mr. Bailey.

Mr. Bailey's employment and move to Binghamton were positive steps for him.  That Mr. Bailey held a job for the first time in his life shows he has the potential to achieve significant change.  While it by no means demonstrates that Mr. Bailey has changed his life permanently, he has made efforts to change and has potential for a successful transition to a law-abiding life.  "[I]t is well established that a district court should consider a defendant's *potential* for rehabilitation in determining a sentence."  *United States v. Wong*, 40 F.3d 1347, 1382 (2d Cir. 1994) (emphasis added); *see also United States v. Barton*, 76 F.3d 499, 503 (2d Cir. 1996) ("A court may depart from the applicable guideline range in view of the defendant's *efforts toward* rehabilitation.") (emphasis added).

In addition, Mr. Bailey demonstrated his efforts at post-offense rehabilitation when, after his arrest in March 2016, he voluntarily enrolled in the Focus Forward Project.  This is a 12-week class run by Focus Forward Project, Inc., "a nonprofit organization dedicated to providing educational programming to federal pretrial inmates and individuals under pretrial supervision."

---

[4]      He relocated at pre-trial services' behest.  Mr. Bailey does not argue that he had the idea to leave New York City as part of his efforts at post-offense rehabilitation, but instead as the first catalyst for change in his life.

(Exhibit A, Letter from Kathy Chen and Sara Gomez, Focus Forward Project, Inc., dated March 10, 2017).  Mr. Bailey was reluctant to participate at first, but within a short period of time he actively shared his goals to change, and often discussed being more involved in his son's life. *See id*.  Mr. Bailey shared stories about his "upbringing, his experiences during prior incarceration and his desire to make the necessary changes in his lifestyle to not end up in the same situation again."  *Id.*  As described by Mr. Bailey's Volunteer Class Facilitators:

> "Rasheed consistently wrote about his desire to change. This is clearly a goal that is at the forefront of his mind, and one that we are confident he can achieve. In the short term, Rasheed shared with us that he wants to fill out school applications, find a good job and be there for his child. In the long term, Rasheed wants to obtain a college degree and be a role model in his son's and others' lives. We are confident that Rasheed will be able to take the lessons he learned in class and apply them in the future in order to reach his goals, both short and long term."

*Id.*  This serves as a good barometer for Mr. Bailey's efforts, and his true desire to change.

Lastly, when Mr. Bailey entered the Metropolitan Detention Center ("MDC"), he immediately took steps to learn about the available classes.  Since then, Mr. Bailey completed a class focused on developing skills with respect to drafting a resume.  He also took a class that focused on the cardio-health.  At the time Mr. Bailey submitted this memorandum he informed the undersigned that he enjoyed taking the classes and was in the process of determining which others to take.

Courts in the Second Circuit have granted substantial departures based on post-offense rehabilitation.  The court in *United States v. Blake*, 89 F. Supp.2d 328 (E.D.N.Y. 2000), departed 21 levels, at least in part, "based upon significant pre-sentence rehabilitation and the probability of continuing steps toward permanent good behavior."  *Id*. at 339 (citing *United States v. Core*,

125 F.3d 74-75 (2d Cir. 1997), and *United States v. Williams*, 65 F.3d 301, 306 (2d Cir. 1995)). Rasheed Bailey is a young man worthy of similar consideration.

Mr. Bailey is not suggesting to the Court that his efforts militate in favor of a *Blake*-like 21-level departure. However, his efforts are worthy of consideration because he has made efforts to make major changes in his life that he hopes to continue upon his release from incarceration, relocation away from New York City and gainful employment. While the above described efforts at post-offense rehabilitation are an admittedly small sample size for Mr. Bailey, it does demonstrate serious efforts and a desire to turn his life around. Being removed from the physical environment where he committed the offense for which he is being sentenced, and attempting to establish a new life in Binghamton, was a benefit to Mr. Bailey. He successfully obtained employment and excelled in performing the tasks he was given. Holding down a job for the first time ever likewise demonstrates the seriousness with which Mr. Bailey takes his need to change his life. Mr. Bailey's behavior also evidences a noticeable change in attitude ever since his arrest in March 2016. He maintains that he intends to change his life after this ordeal is over, and take advantage of classes offered by MDC that will help him to achieve this goal. As such, Mr. Bailey respectfully requests that the Court consider his efforts at post-offense rehabilitation in fashioning an appropriate sentence.

C.  *The Need to Avoid Unwarranted Sentencing Disparities*

Another important factor sentencing courts must consider is "the need to avoid unwarranted sentencing disparities among defendants with similar records found guilty of similar conduct." 18 U.S.C. §3553(a); *see also, Kimbrough,* 552 U.S. at 108. Imposing a custodial sentence within the range calculated by Probation would be at tension with several cases involving defendants with similar backgrounds, who engaged in similar conduct.

19

In *United States v. Jones,* 13 Cr. 654-1 (RWS)*, 2015 WL 5796950, at *2, (S.D.N.Y. Oct. 5, 2015)*, the defendant pleaded guilty to drug offenses involving crack and heroin.  The court assessed an offense level of 31, based in part on the career-offender enhancement for having two prior felony convictions.  *See id.*  Jones pled guilty to conspiracy to distribute, and possess with intent to distribute, between 28 and 112 grams of crack cocaine, in violation of 21 U.S.C. §§846, 841(b)(1)(B).  *See id.*  The court described Jones as a mid-level dealer in a crack and heroin distribution ring.  *See id.* at 3.  The government believed Jones had direct involvement in at least five drug sales.  After considering §3553(a), the district court determined that the defendant did not justify a Guidelines sentence.  *See id.* at 6.  At sentencing, the court reduced Jones' sentence by nearly 116%, from 188 months (at the low end of the Guidelines range) to 72 months.

Mr. Bailey's circumstances are not entirely unlike the defendant in *Jones*.  Indeed, Mr. Bailey even compares favorably to *Jones* in many categories.  The court in *Jones* deemed the defendant a mid-level dealer; Mr. Bailey is a low-level dealer.  Jones participated in at least five known drug sales; Mr. Bailey participated in three known sales.  Both sold crack, but Jones, unlike Mr. Bailey, also sold heroin.  Nevertheless, Jones received a non-Guidelines sentence that equated to an approximately 116-month reduction from his Guidelines range of between 188 and 235 months.  A Guidelines sentence for Mr. Bailey and a non-Guidelines sentence for Jones would be precisely the kind of disparity the Guidelines seek to avoid.

In addition, other defendants similarly situated to Mr. Bailey have received sentences that significantly depart from the range calculated under the Guidelines.  In *United States v. Nixon*, No. 13 Cr. 654-6 (RWS), 2015 WL 3484492 (S.D.N.Y. June 2, 2015)*, the court sentenced the defendant to a non-Guidelines term of 36-months' imprisonment after the defendant pleaded guilty to a charge identical to the instant case.  The government initially indicted the defendant

for conspiracy to distribute over 280 grams of crack cocaine and heroin. *See id.* at 1. After pleading guilty to the lesser-included offense, the court calculated a total offense level of 25. The government also believed he possessed a firearm in connection with the charged offense. Nevertheless, after analyzing the §3553(a) factors, the court deemed it appropriate to impose a non-Guidelines sentence of 36 months' imprisonment, 34 months less than the recommended sentencing range. Mr. Bailey likewise compares favorably to the *Nixon* defendant. In a case related to *Nixon*, a 20-year-old defendant similarly received a non-Guidelines sentence of 36-months', based on a total offense level of 21, however with a CHC of V. *See United States v. Boykins*, No. 13 Cr. 654-7 (RWS), 2015 WL 3485475 (S.D.N.Y. June 2, 2015). In *Boykins,* the court noted how the Guidelines' treated some of the defendants' prior convictions in a "particularly pernicious" manner, for example, by increasing his sentencing range by one and one half years based on a fight between the defendant and a classmate during middle school. Mr. Bailey's criminal history places him in a CHC of IV. Indeed, Mr. Bailey received one criminal history point for each of his two previous convictions for possession of marijuana. These two points increase Mr. Bailey's potential sentence by over one year, which is of questionable value considering that Mr. Bailey has demonstrated difficulty in quitting using marijuana. Keeping in mind the sentences received by the defendants in *Nixon* and *Boykins*, a non-Guidelines sentence for Mr. Bailey would avoid any sentencing disparities among similarly situated defendants.

Notably, Probation agrees that a non-Guidelines sentence is appropriate in this case, particularly given Mr. Bailey's history and characteristics. (PSR ¶120, p. 25).

### III.    Mr. Bailey's Inability to Pay a Fine

In determining whether to impose a fine, the court may consider such factors including the defendant's income, earning capacity, financial resources, and the burden that such a fine would impose on the defendant.  *See* 18 U.S.C. §3572.  Courts typically do not impose a fine where, as here, a defendant has no financial assets and indeed no ability to pay a fine.  As detailed in the PSR, Mr. Bailey has no assets to his name aside from the income he earned while he worked for three months as a stock worker at Macy's.  He has no ability to pay a fine, and such a burden would only hamper his efforts to financially support himself in the future.  For these reasons, Mr. Bailey respectfully requests that this court waive the imposition of a fine in this case.  *See Boykins,* 2015 WL 3485475 at 6.

## IV.    Recommendation Against Denial of Federal Benefits

This Court may, at its discretion, find that Mr. Bailey is ineligible for all federal benefits for up to five years after Mr. Bailey's conviction of his first drug distribution offense.  *See* 21 U.S.C. §862(a)(1)(A).  However, Mr. Bailey has no money and to prohibit him from obtaining federal benefits for the next five years would severely inhibit his continued efforts at post-offense rehabilitation and his pursuit of life as a law-abiding citizen.  Mr. Bailey looks forward to starting a new life once this ordeal is over.  For these reasons, he respectfully asks the Court not to institute a prohibition against federal benefits as a result of his commission of the instant offense.

## <u>CONCLUSION</u>

For the reasons discussed above, and pursuant to the factors listed under §3553(a) Mr. Bailey respectfully submits that his situation militates in favor of a sentence below the applicable Guidelines range.

Dated:      New York, New York
             April 5, 2017

MORVILLO LLP

BY: _____
      Gregory R. Morvillo (GM-1234)

*Attorneys for Defendant Rasheed Bailey*
500 Fifth Ave., 43rd Floor
New York, New York 10110
(212) 796-6330