

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 12, 2017

**BY ECF**
The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:    **United States v. Rasheed Bailey**,
                 16 Cr. 396 (GHW)

Dear Judge Woods:

      The Government submits this letter in connection with the sentencing of defendant Rasheed Bailey, currently scheduled for April 19, 2017, at 2:00 p.m. As more fully set forth below, the plea agreement between the parties (the "Plea Agreement") calculated a United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") range of 41 to 51 months' imprisonment (the "Stipulated Guidelines Range"). Although the United States Probation Department ("Probation") has calculated a Guidelines range of 57 to 71 months' imprisonment, the Government respectfully submits that a sentence within the Stipulated Guidelines Range is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

## Arrest, Indictment, and Guilty Plea

      On March 31, 2016, the defendant was arrested and charged by Complaint in this District with distributing a controlled substance, and possessing with intent to distribute a controlled substance, after he was arrested in an apartment in the in the area of the Lincoln Housing Development (the "Lincoln Houses") in Manhattan, New York, in which law enforcement also found crack and drug-distribution paraphernalia. The defendant was also found in possession of approximately $4,000. The Complaint is attached hereto as Exhibit A.

      On June 8, 2016, a grand jury sitting in this District returned Indictment 16 Cr. 396 (GHW) (the "Indictment"), charging Bailey and twenty-one other defendants with narcotics and firearms offenses. On the same date, a grand jury sitting in this District returned Indictment 16 Cr. 397 (LTS), in which an additional ten defendants were charged with participating in a narcotics conspiracy related to the conspiracy charged before Your Honor, as detailed below.

      Bailey was charged in Count One with conspiring to distribute, and possess with the intent to distribute, 280 grams and more of crack cocaine, in violation of Title 21, United States Code, Sections

846 and 841(b)(1)(A). On January 11, 2017, Bailey appeared before Your Honor and pleaded guilty, pursuant to the Plea Agreement, to the lesser-included offense of conspiring to distribute, and possess with the intent to distribute, a quantity of crack cocaine, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(C).

## Background of the Lincoln Houses Drug Trafficking Organizations

In or about January 2015, the New York City Police Department (the "NYPD") and the Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF") began investigating drug trafficking and related firearms offenses, going back to as early as 2008, in the area of the Lincoln Houses. (PSR ¶ 14). Through this investigation, law enforcement identified two related drug-trafficking crews in the Lincoln Houses: one dominating the East Side of the Lincoln Houses (the "East Side Conspiracy") and one dominating the West Side of the Lincoln Houses (the "West Side Conspiracy"). (PSR ¶ 15). Members of the East Side Conspiracy were ultimately charged in 16 Cr. 397 (LTS), which is proceeding before the Honorable Laura Taylor Swain, and members of the West Side Conspiracy were ultimately charged in the instant case before Your Honor.

The East and West Side conspiracies each operated 24/7 crack-sale operations in the Lincoln Houses. Over the course of approximately 18 months, the NYPD engaged in more than 200 controlled purchases of crack across the East and the West Sides. Notably, in that time period, an undercover officer ("UC") was never turned away for lack of supply—if a dealer ran out of crack, he would pool his supply with his co-conspirators. It was a round-the-clock operation. (PSR ¶ 15).

While these two conspiracies generally distributed crack separately on their respective sides, there were members of each conspiracy that were permitted to cross over and sell on each side of the Lincoln Houses. Moreover, members of each conspiracy protected each other's right to sell exclusively in Lincoln. Outsiders were not allowed. (PSR ¶ 16).

In particular, on the West Side, this protection was done through violence and use of firearms. Firearms were held directly by individuals and were also placed strategically throughout the West Side so that members of the conspiracy would have easy access. These firearms were left in places such as garbages, scaffolding, and the grass—communal spaces also shared by children and other residents. (PSR ¶ 17). The West Side Conspiracy further engaged in violent rivalries with neighboring housing development drug crews. (PSR ¶ 18). These rivalries have resulted in shootings and violence that have terrorized that community.

Moreover, in addition to the violence linked to these drug organizations, the East and West Side Conspiracies have interfered with the lives of law-abiding residents of the Lincoln Houses on a daily basis. Most of the crack sales made to the UCs were made in elevators, stairwells, lobbies, and public hallways. The videos of certain of these sales show the defendants slinging crack while surrounded by children in public spaces at all times of day and night. (PSR ¶ 19). Residents of the Lincoln Houses could not enter or exit certain buildings without running into these crack sale operations.

Had Bailey proceeded to trial, the Government was prepared to offer evidence including but not limited to (i) the testimony of numerous cooperating witnesses; (ii) the testimony of local and

federal law enforcement officers; (iii) narcotics and ammunition seized from various defendants; (iv) audio and video recordings made during controlled purchases of narcotics from certain defendants; (v) surveillance recordings of shootings by at least one member of the conspiracy in the Lincoln Houses; (vi) cellular telephone records; (vii) photographs; and (viii) records from social media websites such as YouTube and Facebook.

### Bailey's Offense Conduct

Bailey has accepted responsibility for selling between 28 and 112 grams of crack as part of his participation in this conspiracy. Indeed, Bailey sold to a UC on approximately three occasions, for a total of approximately 66 twists of crack sold by Bailey and his partners in those sales. (PSR ¶ 22). Two of those UC buys show Bailey working in coordination with codefendant Tuquan Rogers. (PSR ¶ 22). These buys occurred on or about August 4, 2015, and January 19, 2016. (PSR ¶¶ 24, 25). Moreover, on or about March 31, 2016, Bailey was arrested after he was found in an apartment in the Lincoln Houses where law enforcement also discovered (i) marijuana, (ii) approximately 40 twists of crack, (iii) approximately $4,800 in cash—$4,000 of which was found on Bailey's person, (iv) narcotics packaging materials, and (v) scales. (PSR ¶ 26).

### The Guidelines Calculation

Pursuant to the Plea Agreement, the parties stipulated that, among other things, the offense level resulting from Bailey's conduct is 21, and that he had two criminal history points, placing him in Criminal History Category II. Specifically, at the time the Plea Agreement was executed, the Government was aware of the following criminal history:

1. On or about March 17, 2016, the defendant was convicted of Unlawful Possession of Marijuana, a violation, in violation of New York State Penal Law Section 221.10, and received a fine. Pursuant to U.S.S.G. § 4A1.1(c), this sentence results in one criminal history point.

2. On or about April 28, 2016, the defendant was convicted of Unlawful Possession of Marijuana, a violation, in violation of New York State Penal Law Section 221.10, and received a fine. Pursuant to U.S.S.G. § 4A1.1(c), this sentence results in one criminal history point.

3. On or about March 29, 2011, the defendant was convicted in New York County Criminal Court of Disorderly Conduct, a violation, in violation of New York State Penal Law Section 240.20, and was sentenced to a conditional discharge and two days' community service. Pursuant to U.S.S.G. § 4A1.2(c)(1), this sentence results in no criminal history points.[1]

---

[1] This conviction is not reflected on the PSR, but, in any event, does not result in any criminal history points.

Probation agrees that the defendant's offense level is 21, but places the defendant in Criminal History Category IV. Specifically, Probation identified the following sealed conviction about which the Government was unaware at the time the parties entered into the Plea Agreement that results in criminal history points:

1. On or about April 25, 2012, the defendant pleaded guilty, in New York County Supreme Court, to criminal possession of a weapon in the second degree, and was adjudicated a youthful offender. (PSR ¶ 59). The defendant was later sentenced to 16 months to 4 years' imprisonment, which he served in an adult prison facility. (PSR ¶ 59). The defendant was released to parole on March 26, 2015, and was discharged from parole on November 26, 2015. (PSR ¶ 59).

Probation calculates that, pursuant to U.S.S.G. §§ 4A1.1(a), 4A1.2(d)(1), and 4A1.2(e), this sentence results in three criminal history points. Probation then notes that two criminal history points are added, pursuant to U.S.S.G. § 4A1.1(d), because the defendant committed the instant offense while under the criminal justice sentence of probation. Indeed, as noted above, the defendant sold to a UC on or about August 4, 2015, during which time it appears he was on probation. (PSR ¶¶ 24, 25). Based on this calculation, Probation arrives at a total of 7 criminal history points, placing the defendant in Category IV. Probation then calculates a Guidelines range of 57 to 71 months' imprisonment, and recommends a below-Guidelines sentence of 41 months' imprisonment.

While the Government does not dispute Probation's Guidelines calculation, the Government nonetheless continues to believe that a sentence within the Stipulated Guidelines Range of 41 to 51 months' imprisonment is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

## Discussion

*Applicable Law*

The Government respectfully submits that a sentence within the Stipulated Guidelines Range of 41 to 51 months' imprisonment is appropriate for the defendant.

Although the Guidelines no longer play a mandatory role at sentencing, they nevertheless continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States* v. *Booker*, 543 U.S. 220, 252 (2005). "Pursuant to the 'remedy opinion' [in *Booker*], the now advisory Guidelines are to be considered together with the other factors set forth in 18 U.S.C. § 3553(a), by judges fashioning sentences." *United States* v. *Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006); *see also Booker*, 543 U.S. at 261-62. Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall* v. *United States*, 552 U.S. 38, 46 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings, *id.* at 49. *See also United States* v. *Rattoballi*, 452 F.3d 127, 133 (2d Cir. 2006) (the Guidelines "'cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important

exceptions, their calculations were based upon the actual sentences of many judges.'" (quoting *United States* v. *Jiminez-Beltre*, 440 F.3d 514, 518 (1st Cir. 2006) (*en banc*))); *see also Fernandez*, 443 F.3d at 33-34 ("It was not error for the [District Court] to employ the Guidelines range as a starting point and then to determine whether the arguments presented pursuant to the § 3553(a) factors warranted 'lighten[ing]' of . . . or fashioning of 'an alteration to' . . . the advisory Guidelines sentence").

The Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *Fernandez*, 443 F.3d at 27; *see also Kimbrough* v. *United States*, 552 U.S. 85, 108-09 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" (quoting *Rita* v. *United States*, 551 U.S. 338, 350-51 (2007))).

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>   (B) to afford adequate deterrence to criminal conduct;
>
>   (C) to protect the public from further crimes of the defendant; and
>
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established [in the Guidelines];
>
> (5) any pertinent policy statement [issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

*Application*

In light of the circumstances of the instant offense and the defendant's history, a sentence within the Stipulated Guidelines Range of 41 to 51 months' imprisonment is appropriate. The 18 U.S.C. § 3553(a) factors particularly relevant here include the need to reflect the seriousness of the offense, provide just punishment, afford adequate deterrence, and protect the public from further crimes by the defendant. 18 U.S.C. § 3553(a)(2)(A)-(C).

The offense conduct at issue, and the manner in which it was perpetrated here, is undoubtedly serious, and warrants a sentence within the Stipulated Guidelines Range. The defendant participated in a round-the-clock crack-sale operation in a residential housing development. In light of the conspiracies operating on the East and West Sides, the Lincoln Houses were overrun with crack sales and violence. Residents in the Lincoln Houses could not walk through their hallways, use their elevators, or access communal areas without being confronted by crack dealers and users. Moreover, members of the conspiracy exposed innocent residents of the Lincoln Houses to dangerous conditions. Members of the conspiracy kept firearms in public places, including garbage cans and grassy areas within reach of children and other residents, and invited violence by engaging in turf wars with drug-dealing crews from neighboring housing developments.

Further, a sentence within the Stipulated Guidelines Range is necessary to afford adequate specific and general deterrence. The defendant, at only twenty-two years of age, has already had several interactions with the criminal justice system. Even more concerning is the defendant's participation in the instant offense while on probation for another crime, and having only been out of custody for a few months. Unfortunately, the approximately four years the defendant spent in prison on that offense were not sufficient to inspire him to lead a law-abiding life. Moreover, and of serious concern, the defendant has a prior conviction for criminal possession of a weapon, and admits to carrying a gun. A sentence within the Stipulated Guidelines Range is necessary to ensure that the defendant does not return to this path of criminal behavior. Moreover, the Court's imposition of a sentence within the Stipulated Guidelines Range in this case could send a message to others similarly situated to the defendant, who may be contemplating similar criminal acts. New York City's housing developments are plagued by drug crews similar to the West Side Conspiracy. A sentence within the Stipulated Guidelines Range will show that any participation in such a conspiracy is a serious offense that carries significant consequences.

## Conclusion

For the foregoing reasons, the Government respectfully requests that the Court impose a sentence within the Stipulated Guidelines Range of 41 to 51 months' imprisonment.

                                                Respectfully submitted,

                                                JOON H. KIM
                                                Acting United States Attorney

By:   /s/ Amanda L. Houle
       Amanda L. Houle
       Jason M. Swergold
       Assistant United States Attorneys
       Southern District of New York
       (212) 637-2194 / 1023

cc:     Gregory Morvillo, Esq. (via ECF)